## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

SHERYL HUBBELL,

Case No.

          Plaintiff,

vs.

FEDEX SMARTPOST, INC.,
a foreign profit corporation doing
business in Michigan,

          Defendant.

_____/

RAYMOND GUZALL III (P60980)
RAYMOND GUZALL III, P.C.
Attorney for Plaintiff
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
rayguzall@attorneyguzall.com
(248) 702-6122 _____/

> There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge, nor do I know of any other civil action, not between these parties, arising out of the same transaction or occurrence as alleged in this complaint that is either pending or was previously filed and dismissed, transferred, or otherwise disposed of after having been assigned to a judge in this Court.

## VERIFIED COMPLAINT AND DEMAND FOR JURY

NOW COMES Plaintiff, SHERYL HUBBELL, by and through her

attorney, Raymond Guzall III, P.C., by Raymond Guzall III, and for her

Complaint against FEDEX SMARTPOST, INC., a foreign profit corporation

doing business in the State of Michigan, states as follows:

## COUNT I

## GENDER DISCRIMINATION

1.  Plaintiff SHERYL HUBBELL, is female, and at all times pertinent hereto, was employed by the Defendant FEDEX SMARTPOST, INC., in Wayne County, State of Michigan.

2.  Defendant FEDEX SMARTPOST, INC., is a foreign profit corporation doing business in the State of Michigan, in Wayne County, State of Michigan.

3.  Plaintiff remains employed by Defendant at the time of the filing of this lawsuit.

4.  Plaintiff worked for Defendant for approximately 8 years.

5.  Men and women were treated differently at Fedex SmartPost and Plaintiff was discriminated against based on her gender.

6.  Ms. Hubbell was singled out in regards to discipline and treated differently than other similarly situated male employees.

7.  Plaintiff was denied promotions and management positions by Defendant based on her gender and male employees were given promotions and management positions ahead of her.

8.  In 2010, Plaintiff applied and interviewed for a management position

2

but it was given to a male employee that Plaintiff had trained.

9.    Plaintiff was discouraged by Management from applying for
       leadership roles and management positions because of her gender,
       whereas male employees were encouraged to apply for management
       positions.

10.   Plaintiff was told numerous times by management that she should
       stop considering or applying for management positions because of
       her gender.

11.   Plaintiff was told by management that women are better suited for
       administrative positions and men are better suited for management
       positions.

12.   On another occasions, Plaintiff was told by management, "Not to
       sound sexist, but most women perform better in administrative roles
       and seem to trend toward those roles," and that, "male employees do
       better in leadership roles and most females don't possess the
       competencies necessary to be successful as leaders, that is why you
       find more women as secretaries or clerks."

13.   Plaintiff was told by a "hub manager" that he had no intention on
       promoting her to management positions because of her gender, yet

3

male employees were encouraged to pursue management positions and in fact were given those positions which included increased compensation.

14. Plaintiff was told by management and human resources to demote from her position as a Lead based on her gender.

15. Plaintiff was demoted to a role that did not include leadership supervisor duties by Defendant based upon her gender.

16. Plaintiff was not allowed to attend certain meetings that as her position as a Lead requires, yet male employees similarly situated as Plaintiff are allowed to attend.

17. Plaintiff was belittled, demeaned and treated with hostility by management after making complaints of management's discrimination towards women in general, but more particularly, herself.

18. Plaintiff was and is treated differently by management after making her complaints. Subsequently, management began to give her write-ups and poor reviews so she couldn't advance, despite many of her full time co-workers who are of the opinion she does a great job and are of the opinion she is being harassed by management for

4

speaking out and engaging in protected activities.

19. After Defendant brought in Todd Treman to be the hub manager in the beginning of 2011, Plaintiff and women in general were treated harsher by the Defendant. Throughout the year of 2011, more females were demoted than males and more males were hired or promoted to management positions.

20. At the beginning of the year 2012, there were ten male managers and one black female manager.

21. In January 2012, Plaintiff was called into a meeting with management and human resources where she was told by the hub manager, Todd Treman, "This is the last chance I'll give you to take a step down, things will continue to get harder for you from here on out if you don't." Plaintiff was further told, "Leadership roles are typically suited for male employees, I don't understand why you won't comply with my requests [to step down or demote herself], you've been asked many times now."

22. Plaintiff was given less of a raise than all other employees when raises were previously distributed in the year 2013.

23.  Fedex SmartPost attempted to cover up the fact that they discriminate against women in the workplace by promoting a part time female employee to a full time Lead and then to a Dock Manager all within a matter of months, and that never had been done before in that short of a time span with any other employee.

24.  That attempt to cover up the fact that Defendants discriminate against women in the workplace by promoting a part time female employee to a full time Lead and then to a Dock Manager all within a matter of months was done after Plaintiff filed her complaint of gender discrimination with the EEOC/Michigan Department of Civil Rights.

25.  Plaintiff was treated differently by Defendant because of her gender, in violation of Title 7, Civil Rights Act of 1964, seq., 70l et seq., 42 U.S.C.2000e, et seq.

26.  The Court has jurisdiction based upon Plaintiffs federal claims, and venue is proper with this Court.

27.  Defendant has an illegal pattern and practice of discriminating against female employees.

6

28. Defendants management made statements regarding how they discriminate against their female employees.

29. Because of the illegal conduct of the Defendant, Plaintiff has suffered emotional damages and wage loss, among other damages as stated herein, and to be included within this Count.

## COUNT II

## RETALIATION

30. Plaintiff re-alleges and incorporates Paragraphs 1 through 29 as though set forth in full word for word and paragraph for paragraph.

31. Plaintiff filed a complaint with the EEOC/Michigan Department of Civil Rights against Fedex SmartPost in approximately October of 2013.

32. Plaintiff's Right to Sue letter was postmarked July 22, 2014, and she received another Right to Sue letter in late August of 2014, closing out her EEOC complaints.

33. Plaintiff's Complaint is timely filed with this Court.

34. Plaintiff has been retaliated against by Fedex SmartPost management to an extreme that no one has ever seen before at that office.

35.  Plaintiff suffered an increase in hostile treatment after filing the EEOC complaint.

36.  Plaintiffs every action was even more closely monitored after filing the EEOC complaint.

37.  Plaintiff was retaliated against in November 2013 when she called off work 1 hour before her scheduled shift and later provided management with a doctor note for an excused absence. Although Plaintiff had called in 1 hour ahead of shift and provided medical documentation for the absence, Plaintiff was still issued a write up for un-excused absence and not offered vacation day as compensation. Plaintiff had followed company attendance policy, and the Defendant Company refused to follow their own policy.

38.  Plaintiff filed another charge with the EEOC/Michigan Department of Civil Rights against Fedex SmartPost on or about March 10, 2014 alleging retaliation.

39.  Plaintiff was retaliated against in violation of Title 7, Civil Rights Act of 1964, seq., 70l et seq., 42 U.S.C.2000e, et seq., and other applicable law, and in particular, because she filed a discrimination charge with the Michigan Department of Civil Rights/EEOC, against

8

Defendant.

40.    The law holds, "Title VII's anti-retaliation provision prohibits any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Thompson v N Am Stainless, LP*, 131 S Ct 863, 868; 178 L Ed 2d 694 (2011), citation omitted.

41.    The law holds that, "...punitive damages are warranted when the employer engages in conduct that carries with it a "*perceived risk* that its actions will violate federal law."" *EEOC v Harbert-Yeargin, Inc*, 266 F3d 498, 513 (CA 6 2001), citation omitted.

42.    Punitive damages are allowed by law: "...(5) jury could have concluded that managers engaged in a pattern of calculated retaliatory conduct so egregious as to support award of punitive damages; (6) retaliation was properly imputed to corporate employer; and (7) a 50:1 ratio of punitive to compensatory damages did not violate due process." *Jeffries v Wal-Mart Stores, Inc*, 15 Fed Appx 252 (CA 6 2001).

43.    After filing the EEOC complaint, Plaintiff was written up for an un-excused absences even though Plaintiff followed the company

9

attendance policy.

44.   After filing the EEOC complaint, Plaintiff was frequently written up for fabricated violations and or treated worse by management for violations they alleged against her and proceeded to take action in front of other employees whereas no one else was treated that way, in an attempt to build up a documented excuse for the Defendant employer to keep Plaintiff from being promoted and to build an excuse to terminate Plaintiff in the future.

45.   After filing the EEOC complaint, Defendant attempted to force Plaintiff to accept and approve changes imposed by management to her time-sheet in violation of company policy and procedure and when she wouldn't sign off on the changes, she was threatened with insubordination and additional write ups.  Plaintiff was eventually written up for not approving the time-sheet changes made by management.

46.   In approximately March, 2014, Plaintiff was retaliated against when she was issued a write-up in her work area in front of other employees for a claimed mis-sorted package although Management knew that there had been floor plan changes in her work area and

10

the shipping crew also typically made changes to package locations after employees had left the area.  Plaintiff was treated differently than other employees as other employees had been given a grace period for claimed mis-sorts and some were only given a verbal counseling with the floor plan change, yet Plaintiff was forced to sign a written disciplinary action form.

47.   In approximately April 2014, Plaintiff was retaliated against when she was approved to leave work early for being sick by John McLaughlin and Steve Hillebrand, managers.  However, Defendant's then violated their own policy, as Plaintiff was still written up for an un-excused absence despite the managers approval and the subsequent doctors note Plaintiff had submitted the next day to them. That was not done to other employees who have been in the same situation, only done to Plaintiff.

48.   Plaintiff was retaliated against by managers, when threatened with disciplinary action if she did not remove her tinted safety glasses that she had a medical note for.  That treatment was not done to other employees including a previous employee who had worn sunglasses for a considerable length of time on daily basis.

11

49. On or around April 2014, Plaintiff was not compensated by Defendant after Defendant requested that Plaintiff leave after lunch and then take the next week off, where normally employees are compensated by management when told to leave the facility for reasons assigned by management. Management then attempted to cover that up by sending a letter to Plaintiff's house pretending to not know the reason Plaintiff left work.

50. On or around May 2, 2014 Plaintiff was retaliated against when Plaintiff attempted to pick up her paycheck from a clerk and manager, Josh Ocelnik, refused to give Plaintiff her paycheck unless she would agree to clock in and approve unnecessary alterations in Mytime program that Defendant made to her time sheet. Ocelnik tried to set Plaintiff up in an argument by refusing to give her the check until a driver witnessed what was going on. Ocelnik then gave Plaintiff the check, and Plaintiff found out later that Ocelnik told the clerk that he would need him to sign a statement that Plaintiff was rude and displayed unnecessary conduct. Other employees who came to pick up paychecks were not told to clock in and approve

changes to their time sheets before they would be given their
paychecks.

51.   On or around May 6 or 7th, 2014  Plaintiff was retaliated against when
Defendant disabled her badge so that she could not clock in or out all
day in the computer, forcing Plaintiff to have to report her time-sheet
to management on paper.  The next day, Plaintiff was confronted by
management in front of Plaintiff's co-workers, to harass and
embarrass Plaintiff, and told to stop what she was doing and
immediately go to the time clock and approve changes in the Mytime
program even though it is against company policy to force an
approval to the time-sheet without giving Plaintiff the proper time as
stated in the MyTime program rules which Plaintiff follows.

52.   On or around June and August, 2014, Plaintiff was retaliated against
further when Defendants recognized Plaintiff's peers with awards at a
big monthly meeting with all employees and management present,
yet Plaintiff was purposely by-passed from receiving
acknowledgments or awards.  Further, Plaintiff is not allowed to be
recognized like her peers because she is restricted from assuming a
leadership role per the demotion instructions by management.

53.    On or around, June 19, 2014, Plaintiff was retaliated against when manager Chris Jensen told Plaintiff in front a coworker that Plaintiff violated the company security policy when Plaintiff used the restroom without first requesting permission from management.  Plaintiff was treated differently when a Manager accused Plaintiff of committing a breach of security for using the restroom.  This was not done to other employees, but only done to Plaintiff.

54.    On or around July 2, 2014, Plaintiff was retaliated against when managers William N. and Lauren F. told Plaintiff's Supervisor over the radio to send Plaintiff out early from work for speaking with a co-worker.  This was not done to other employees who spoke to their co-workers, only to Plaintiff.

55.    On or around, July 28, 2014, Plaintiff was retaliated against when a manager asked a coworker what we were talking about while we were clocked out for lunch, Plaintiff was treated differently than other employees as Management did not inquire to the content of other employee conversations off the clock.

14

## COUNT III

## HOSTILE WORK ENVIRONMENT - Retaliation

56.    Plaintiff re-alleges and incorporates Paragraphs 1 through 55 as
though set forth in full word for word and paragraph for paragraph.

57.    Defendant took Plaintiff's login access to its' computers away in
approximately August or September 2013.

58.    Defendant employees told Plaintiff that she was no longer allowed to
access Defendants' computer system in approximately August of
2013.

59.    All other Defendant employees are allowed to clock in differently
than Plaintiff and therefore she is now being paid less money than all
other employees in her classification.

60.    Defendant, subsequent to the EEOC filings, increased its' level of
hostility toward Plaintiff to the point that they were and are watching
and timing her every move including any conversation had with a co-
workers and how much time she spends in the bathroom.
Defendant's did not treat any other employee like they treated
Plaintiff, and by their actions caused her additional harm and stress.

61.    Defendant increased its' hostile treatment of Plaintiff subsequent to

15

the EEOC complaints in that management for the Defendant told

Plaintiff's Supervisors and co-workers not to speak to the Plaintiff,

and if they did speak to her they would question that employee as to

the content of the conversation, including conversations that were

"off the clock", causing Plaintiff and coworkers fear and further

alienating Plaintiff from the rest of her coworkers. No other employee

received that kind of hostile treatment.

62.  Defendants' security was directed to wand Plaintiff for metal upon

entry to the building every day, even though she did not beep when

going through the metal detectors, starting around late October of

2013.

63.  Defendant also frequently checked Plaintiffs' signature on the sign

out log sheets to use the restroom.

64.  Plaintiff is only given a 3 minute window to clock into work, and is not

allowed to clock in outside of that 3 minute window. However, all

other like Defendant employees (Plaintiff's peers) are allowed to

clock into work up to 15 minutes prior to their shift starting, and

Plaintiff is not allowed to do so, in continuation of the hostile work

environment against Plaintiff.

65. Plaintiff was subject to hostile treatment by way of threats and intimidation by Defendant. If Plaintiff, would not do as strictly asked by Defendant's management, Plaintiff was threatened with write ups for insubordination. At times, Defendant executed on their threats. No other employee endured anything close to that kind of treatment.

66. For approximately 2 to 3 weeks in February of 2014, Plaintiff was forced to sign off on her time sheets by Defendant on almost a daily basis, when it was not necessary to do so, as the time sheets were accurate. Yet Defendant made unnecessary changes to Plaintiff's time sheets anyway, and tried to force her to sign off on them.

67. Plaintiff then complained to Human Resources on or about February 6, 2014 about the fact that Defendant made unnecessary changes to Plaintiff's time sheets anyway, and tried to force her to sign off on them, and yet that behavior by Defendant still continued for weeks.

68. Plaintiff had no disciplinary actions in her work record until Todd Treman came into management at Defendant FedEx, at the location the location Plaintiff worked.

69. Plaintiff did not have any bad reviews until Todd Treman came into management at Defendant FedEx, at the location Plaintiff worked.

17

70. Plaintiff received numerous awards and recognition for her work until Todd Treman came into management at Defendant FedEx.

71. All of the retaliatory acts combined equate to a hostile work environment against Plaintiff.

72. Defendant did everything they could do to make Plaintiff's life at work as horrible and as hostile as possible so she would quit her job, and ultimately forced her to seek medical advice.

73. Defendant intentionally set Plaintiff up to fail on the job and attempted to sabotage her in the workplace.

74. As a result of Defendant's illegal acts as outlined and stated herein, Plaintiff has been greatly damaged, in violation of the afore-stated causes of action, in that she has suffered and will be forced to suffer great economic and emotional harm, a loss of earning capacity, salary loss, emotional injuries with pain and suffering, including but not limited to emotional distress and mental anguish, all of which she has suffered as a result of the treatment by Defendant named herein, and from which Plaintiff currently suffers and can reasonably be expected to suffer from for the rest of her life.

75. The wrongful and illegal actions of Defendant have damaged, and

continue to damage Plaintiff, including but not limited to past, current and future wage loss and other benefits including but not limited to 401k loss, costs, interest, exemplary and/or punitive damages and attorney fees.

76.   Plaintiff has been damaged well in excess of the jurisdictional amount of $75,000.00.

WHEREFORE, your Plaintiff prays for judgment against Defendant, FEDEX SMARTPOST, a foreign for profit corporation doing business in the State of Michigan, in an amount well in excess of the jurisdictional amount of $75,000.00, plus costs and interest, including past, current and future damages and wage loss, 401k loss and other benefits, exemplary damages, punitive damages, and attorney fees for the illegal acts of Defendant as stated herein, and all other damages afforded by law to Plaintiff.  Plaintiff further requests all other relief the Court deems appropriate in her favor as afforded by law.

The facts as stated within this Verified Complaint are true to the best

of my knowledge, information and belief, and I will testify so in court.

$\text{\textit{Sheryl Hubbell}}$   10-6-14
SHERYL HUBBELL

Subscribed and sworn to before me
this ___6___ day of __October__, 2014.

Raymond Guzall III

Notary Public Oakland County, MI
My commission expires: 2-6-2015

## JURY DEMAND

Plaintiff demands trial by jury in this matter.

Respectfully submitted,

RAYMOND GUZALL III, P.C.
/s/ Raymond Guzall III
RAYMOND GUZALL III (P60980)
Attorney for Plaintiff
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
(248) 702-6122

20