UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERYL HUBBELL

                Plaintiff,

                                              CASE NO. 14-13897
v.                                       HON. GEORGE CARAM STEEH

FEDEX SMARTPOST, INC.,

                Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DOC. 19) AND GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION TO STRIKE THE MCCLOSKEY AFFIDAVIT (DOC. 25)**

       This is a case alleging discrimination and retaliation under Title VII of the Civil

Rights Act of 1964.  Plaintiff Sheryl Hubbell ("Hubbell") was employed by FedEx

SmartPost ("FedEx") at its Belleville, Michigan, facility (the "Detroit facility").  In Count 1,

Hubbell claims that her supervisors at FedEx demoted her from a "lead parcel sorter"

position on the basis of her sex.  In Count 2, Hubbell claims that her supervisors

retaliated against her after she filed an EEOC charge concerning the demotion.  Count

3 alleges hostile work environment on two different theories: sex-based harassment and

retaliatory harassment.  And in Count 4, which Hubbell added in her amended

complaint, Hubbell alleges that her supervisors terminated her in retaliation for filing the

instant lawsuit.

       Now before the court are two motions:  FedEx's motion for summary judgment

(Doc. 19) and FedEx's motion to strike the affidavit of Rebecca McCloskey (Doc. 25).

The motion to strike is collateral to the summary judgment motion.  For the reasons

explained below, the Court will grant the motion to strike in part and deny it in part.  The Court will not strike the affidavit of Rebecca McCloskey, but the Court will allow FedEx to depose her.  For the reasons explained below, the Court will grant the summary-judgment motion in part and deny it in part.  The Court will dismiss Count 3 but will not dismiss Count 1, 2, or 4.

## I. BACKGROUND[1]

### A.    FedEx Hires Hubbell and Promotes Her to Lead Parcel Sorter.

FedEx hired Hubbell as a part-time parcel assistant at its Detroit facility in September 2006.  (Hubbell Dep., Pl.'s Ex. 2, at 17).  After about a year as a parcel assistant, Hubbell was promoted to the position of full-time parcel-sorter.  (*Id.* at 22).  Hubbell worked as a parcel sorter for about three years, and she was promoted to the position of lead parcel sorter in 2010.  (*Id.* at 23).  A lead parcel sorter is a parcel sorter with some additional supervisory responsibilities.  It is not considered by FedEx to be a management role.

According to Hubbell, during her first few years at FedEx, she received a number of awards for her exemplary job performance and did not receive any disciplinary write-ups.  (Hubbell Dep. 122-23, 184).  One part of Hubbell's job as a parcel sorter and then a lead parcel sorter was to stack parcels on a pallet and wrap the pallet for subsequent transportation.  (*See id.* at 74-75).  According to coworker Alphonse Reed, whose job in shipping required him to retrieve the loaded pallets from Hubbell's work area, Hubbell's

_____

[1] All facts summarized in this section are taken from the evidence in the record, construed in favor of Hubbell, the non-moving party.

-2-

pallets were "always pretty neat."  (Reed Dep., Pl.'s Ex. 5, at 145).[2]  By contrast, under

the supervision of the lead parcel sorters who succeeded Hubbell, the pallets would

sometimes be "leaning over."  (*Id*.).  On this basis, Mr. Reed believes that Hubbell did "a

better job" than her successors.  (*Id*.; *see also* Reed Aff., Pl.'s Ex. 4, ¶ 15).

### B.    Leonard Treman Takes Over as Hub Manager at the Detroit Facility and Tells Hubbell to Step Down as Lead Parcel Sorter.

In February 2011, after Hubbell had been a lead parcel sorter for about a year,

Leonard ("Todd") Treman replaced Heather Friend as the senior manager at the Detroit

facility.  (Treman Dep., Pl.'s Ex. 1, at 5, 100; Hubbell Dep. 15).  Under Mr. Treman's

watch, many of the managers at the Detroit facility were replaced.  (*See* Reed Dep. 42).

When Mr. Treman took over in early 2011, there were at least two women in

management roles, but at some point in 2012, there were no longer any female

managers.  (*See* Treman Dep. 31-32; Jensen Dep., Pl.'s Ex. 27, at 22-23; Ocelnik Dep.,

Pl.'s Ex. 28, at 15).  Starting in 2013, however, several women were promoted or hired

into management positions.  (Treman Dep. 32-34; Jensen Dep. 25, 27-28).

_____

[2] FedEx generally objects to the Court's consideration of Mr. Reed's testimony, arguing that "the majority of Reed's testimony is based on speculation and innuendo." (*See* Doc. 26 at 5).  Although the Court agrees that some of Mr. Reed's testimony apparently fails to satisfy the foundational requirements of Federal Rules of Evidence 602 and 701(a), the Court finds that much of Mr. Reed's testimony has an adequate foundation and may therefore be considered.  Mr. Reed testified that although he did not work in Hubbell's department, he regularly visited Hubbell's workplace in order to pick up pallets.  He could also observe many of the activities at the Detroit facility from his work area.  In this opinion and order, the Court will only reference those parts of Mr. Reed's testimony that have an adequate foundation.  Moreover, the Court will not reference or consider the parts of Mr. Reed's testimony in which he conclusorily states that FedEx discriminated or retaliated against Hubbell.  *See Arendale v. City of Memphis*, 510 F.3d 587, 605 (6th Cir. 2008) ("In order to survive summary judgment, Plaintiff cannot rely on conjecture or conclusory accusations.").

Hubbell testified that in August 2011, Mr. Treman had a private meeting with her in which he pressured her to step down from her role as a lead parcel sorter. (Hubbell Dep. 141). Mr. Treman allegedly told Hubbell that women are not well-suited for management roles. (*Id.* at 133). Mr. Treman also allegedly said, "[N]ot to sound sexist, but women are typically better suited to administrative and secretarial roles." (*Id.* at 150; *see also id.* at 180, 222). In his deposition, Mr. Treman repeatedly and emphatically denied making any such comments. (Treman Dep. 21, 25). In January 2012, Hubbell had a second meeting with Mr. Treman, in which Mr. Treman and others encouraged her to step down. (Hubbell Dep. 43-44). There is no evidence that Mr. Treman or other employees made comments about women's suitability for management roles at this second meeting.

### C.    FedEx Managers Allegedly Lay Foundation for Hubbell's Demotion.

Although the time frame is not exactly clear from the record, at some point in 2011, Mr. Treman and the lower-level managers allegedly began to "set [Hubbell] up to fail." (Hubbell Dep. 93). Hubbell testified that Mr. Treman excluded her from important meetings. (*Id.* at 223-27). Hubbell also testified that managers started giving her assignments that would necessarily take her outside of her work area, and they would then criticize her for failing to supervise the parcel sorters in her work area (*Id.* at 85-88). Alphonse Reed stated in his deposition that he observed that Hubbell was frequently assigned to supervise the "L line," which Mr. Reed described as "the hard side" of the Detroit facility because it was particularly busy. (Reed. Dep. 88). After assigning Hubbell to the L line, management would dismiss the parcel assistants and

-4-

sorters who worked under Hubbell, causing her team's performance to suffer. (*See id.*).
According to Mr. Reed, male lead parcel sorters were also sometimes assigned to the L
line, but they, unlike Hubbell, were given the resources that they needed to complete
their work effectively. (*See id.* at 88, 101-02). Hubbell ultimately concluded that she
was being "sabotaged," based on Mr. Treman's alleged remarks that women are not
suited for management roles and based on what she deemed to be management's
unreasonable expectations of her. (Hubbell Dep. 93, 140-41, 148-50; *see also* Reed
Dep. 88-89, 92-94).[3]

Hubbell received six disciplinary write-ups in 2012 and 2013. (*See* Hubbell Dep.
122-41; Pl.'s Ex. 8; Pl.'s Ex. 9). Before this time, Hubbell had never received a
disciplinary write-up. (Hubbell Dep. 122). Hubbell testified that a manager "fabricated"
the first "write-up . . . to build a case against [her] . . . because [Hubbell is] a woman."
(*Id.* at 122-23). Hubbell received her second write-up for her "disruptive" reaction after a
manager sent a negative email about her team to all of the other managers. (*Id.* at 126-
29). At her deposition, Hubbell did not deny that she behaved as alleged, but she
testified that the email had been unfair and that male lead parcel sorters' teams were
not criticized in the same way. (*Id.* at 129). The third write-up was for being tardy.
Hubbell testified that this discipline was unwarranted because she had a valid excuse

---

[3] Hubbell testified that other employees also believed that she was being
sabotaged. (Hubbell Dep. 151). Such testimony is inadmissible hearsay, and the Court
may not consider it in ruling on the instant summary-judgment motion. These
employees were not managers, and they were not otherwise speaking within the scope
of their employment. *See* Fed. R. Evid. 801(d)(2)(D); *Carter v. Univ. of Toledo*, 349
F.3d 269, 275 (6th Cir. 2003). The same analysis applies to Hubbell's later testimony
that her subordinates thought that she was a good lead parcel sorter. (*See* Hubbell
Dep. 173). The Court will not consider such testimony.

for being late. (*Id.* at 130-31). The fourth write-up was for absenteeism. Hubbell testified that she should not have received this discipline, because work had been canceled that day due to a "bad snowstorm." (*Id.* at 131). The fifth write-up was also for absenteeism. Hubbell could not remember the details of the incident, but she claimed that this write-up, like all of the others, was issued "because [she is] a woman and because [she] was trying to move up in the company." (*Id.* at 134-35). The sixth disciplinary write-up was for a safety violation. Hubbell testified that her manager lied in the write-up and that the safety violation never happened. (*Id.* at 140-41).

In addition to "sabotaging" Hubbell and repeatedly disciplining her, FedEx management allegedly subjected Hubbell to intense scrutiny during the period following the 2011 meeting between Hubbell and Mr. Treman. Mr. Reed sometimes observed "[s]everal managers" standing on a catwalk watching Hubbell. (Reed Dep. 76). Mr. Reed also stated in his deposition that Hubbell was not "allowed to talk." (*Id.* at 28). Mr. Reed testified that "[w]hen I would go over [to Hubbell's workplace] and talk to her[,] . . . [the managers] would come tell me, you know, Al, you don't have time to talk. But I could go to somebody else and, you know, talk and they wouldn't say nothing." (*Id.* at 76).[4]

---

[4] Hubbell also offered testimony and other evidence that various employees had told her that they had been questioned by FedEx managers about their interactions with her. (*See* Pl.'s Ex. 25; Hubbell Dep. 108-10, 109-10, 116, 251). The Court cannot consider such testimony and evidence as substantive proof that these employees were questioned. *See supra* note 3. However, the Court can and will consider this evidence as proof that the employees made these statements to Hubbell. The statements themselves (regardless of whether they were true) could have contributed to a hostile work environment. *See Paasewe v. Action Grp., Inc.*, 530 F. App'x 412, 414 n.5 (6th Cir. 2013) (unpublished).

Hubbell received negative annual performance reviews in 2012 and 2013.  (*See* Hubbell Dep. 145-50, 171-73; Def.'s Ex. 3).  In the 2013 review, in particular, manager Joshua Ocelnik wrote a number of critical comments about Hubbell, including that

> Sheryl seems to struggle with building work relationships with her peers. Her demeanor is typically very work oriented and leaves little room for the belief's [sic] or viewpoints of others.  Historically, there have been several incidents reported to or by management relating to work performance in which Sheryl has become confrontational and defensive.

(Def.'s Ex. 3).  Both annual performance reviews had a self-evaluation section.  In 2012, Hubbell rated herself a perfect five out of five in every category and wrote that "Management's comments and ratings are invalid."  (Hubbell Dep. 146).  In 2013, Hubbell refused to rate herself, but she wrote a lengthy narrative response to her manager's negative assessment of her:

> I disagree with the comments and ratings made by Joshua Ocelnik on my performance evaluation, as many of his statements are untrue and more closely resemble a personal attack than a competency evaluation. . . . [A]lthough my competencies in the role [of lead parcel sorter] in many cases exceed the companys [sic] expectations of the lead parcel sorter position, I am not comfortable to list these examples based on the fact that I have been harrassed [sic] by the management staff at this facility, and have been intensely&excessively [sic] micromanaged and scrutinized with negative attention consistantly [sic] directed toward my positive contributions and accomplishments by the management staff at this facility led by Todd Treman, and fear further retaliation. . . .

(Def.'s Ex. 3).  After the negative 2013 performance review, Hubbell received only a three-cent raise.  (Hubbell Dep. 231).  Mr. Reed stated in his affidavit that "other employees like myself received a 50 cent raise."  (Reed Aff. ¶ 13).

### D.     Hubbell Is Demoted to Parcel Sorter.

On August 27, 2013, Hubbell was demoted from lead parcel sorter to parcel sorter.  (Pl.'s Ex. 10).  The demotion write-up is signed by manager Joshua Ocelnik and

a human-resources representative, (*see id.*), but Mr. Treman testified that he would

have had to approve the demotion, (Treman Dep. 10-11).  Hubbell was told about her

demotion at a meeting with Mr. Ocelnik and two human-resources representatives.

(Hubbell Dep. 180).  The individuals present at the meeting did not tell Hubbell that she

was being demoted because of her sex.  (*See id.* at 180-81, 185).

        According to the demotion write-up, Hubbell was demoted due to her purported

"fail[ure] to meet the job standards of a Lead Parcel Sorter."  (Pl.'s Ex. 10).  She had

allegedly "acted unprofessionally" in meetings on April 8, June 21, and July 11, and she

had failed to cooperate with her performance review in 2013.  (*Id.*).  Hubbell had also

allegedly acted "unprofessional[ly] . . . in her interactions with her manager during a

meeting" on August 6.  (*Id.*).  At her deposition, Hubbell denied that she had acted

"unprofessionally" on any of the dates listed in the demotion write-up.  (Hubbell Dep.

170).  Rather, she testified, "I recall stating the truth and that the management staff

would have liked to turn what I had stated into something negative for their benefit to

use to eventually try to demote me because I'm female."  (*Id.*).

        Hubbell was replaced as lead parcel sorter by a male.  (Reed. Dep. 50).

Alphonse Reed testified in his deposition that Hubbell's successors in the position of

lead parcel sorter were less effective than Hubbell because their pallets were not as

well-packed as Hubbell's.  (*Id.* at 145).

        Shortly after Hubbell's demotion, FedEx's alleged monitoring of Hubbell

increased.  The security guards began to "wand[] [her] every day."  (Hubbell Dep. 252-

53).  James Massie, one of the security guards, told Hubbell that management had

given him specific instructions "to treat [Hubbell] differently."  (*Id.*).  Mr. Massie told

Hubbell to "watch out or watch [her] back, so to speak, that management staff was plotting against [her]." (*Id.* at 253).

### E.   Hubbell Files Her First EEOC Charge, and FedEx Management Allegedly Retaliates Against Her.

On November 7, 2013, a couple of months after her demotion, Hubbell filed an EEOC Charge of Discrimination with the Michigan Department of Civil Rights. (Pl.'s Ex. 12). She alleged that she had "been subjected to disparaging remarks regarding [her] sex that were made by [her] supervisor and Hub Manager" throughout her employment. (*Id.*). She also alleged that had been demoted from her position as lead parcel sorter due to her sex and in retaliation for a January 9, 2013, complaint she had made to the FedEx human resources department about the disparaging remarks. (*Id.*).

Human-resources representative Vivian Garrey testified that when an employee files an EEOC charge, she is made aware of the charge. (*See* Garrey Dep., Pl.'s Ex. 29, at 30). The attorney at FedEx conducts a "confidential investigation," and Ms. Garrey assists in the investigation. (*Id.* at 26-30). Moreover, Ms. Garrey informs the hub manager, Mr. Treman, of the charge. (*Id.* at 30).

Hubbell received a number of disciplinary write-ups in the months following her first EEOC charge. (*See* Hubbell Dep. 76-77, 190-202; Pl.'s Ex. 13; Pl.'s Ex. 14; Pl.'s Ex. 15; Pl.'s Ex. 16). Hubbell repeatedly stated in her deposition, and occasionally wrote on the write-ups themselves, that she believed that the disciplinary write-ups were issued in retaliation for her EEOC charge. (*See* Hubbell Dep. 191). Hubbell testified that other employees were not punished for doing the things that she was accused of doing. (*Id.* at 199). Hubbell could not remember all of the details of the various

incidents, however, (*see id.* at 190-91), and she did not deny all of the factual allegations, (*see id.* at 201-02).

The managers at the Detroit facility allegedly retaliated against Hubbell in other ways, as well.  Hubbell stated in her deposition that after she filed her EEOC charge, all of the other full-time employees were allowed to clock in to the job fifteen minutes before the start of their shifts and clock out fifteen minutes after the end of their shifts, but she was only allowed to clock in three minutes before her shift started and clock out three minutes after her shift ended.  (Hubbell Dep. 107-09).  The result was that those other employees had an opportunity to make more money than she did.  (*Id.* at 109).  Some evidence contradicts Hubbell's claim that FedEx retaliated against her by not allowing her to clock in early.  Hubbell wrote in her second EEOC charge that "[o]n or about *August 29, 2013*, I was given an email that stat[ed] that I could not punch in more than three minutes prior to the start of my shift. . . .  Mean while, [sic] other coworkers with the same job title are allowed to punch in fifteen minutes prior to the start of the shift . . . ."  (Pl.'s Ex. 17 (emphasis added)).  That email would have been sent before the EEOC charge was filed, suggesting that if Hubbell's privilege to clock in fifteen minutes early had indeed been taken away, it must have been taken away because she had been demoted, not in retaliation for her (yet unfiled) EEOC charge.  Moreover, manager Christopher Jensen testified that employees are only allowed to clock in early when their work requires it.  (Jensen Dep. 89).

Hubbell testified in her deposition that FedEx's purported monitoring of her actions continued after she filed her EEOC charge.  (*See* Hubbell Dep. 108-10).

-10-

### F.      Hubbell Files Her Second EEOC Charge.

On March 10, 2014, Hubbell filed a second EEOC charge, this time alleging that FedEx retaliated against her after she filed her first EEOC charge.  (Pl.'s Ex. 17).

According to Hubbell, FedEx's alleged pattern of retaliation continued following her second EEOC complaint.  Hubbell received a write-up on April 23, 2014, for four alleged unexcused absences.  (Pl.'s Ex. 18).  Hubbell wrote on the write-up that "this disciplinary action form is in retaliation for a complaint I filed against the company with the EEOC."  (*Id.*)  Hubbell testified at her deposition, "I believe [I was sick]. I believe I had a doctor's note . . . ."  (Hubbell Dep. 234).  In April 2014, two managers threatened to write Hubbell up for wearing "tinted safety glasses" unless she would remove them.  (*Id.* at 238-41).  Hubbell had a temporary medical condition that required her to wear tinted glasses, and Hubbell had a note from an optometrist explaining her need for the glasses.  (*Id.*).  Moreover, at least one other employee had regularly worn sunglasses and had not been punished.  (*Id.* at 241).

The alleged retaliation continued through the summer of 2014.  First, a manager refused to give Hubbell her paycheck until she approved changes on one of her time sheets, in violation of company policy.  (Hubbell Dep. 236-37).  Second, Hubbell went on medical leave for a period, and when she returned, it took FedEx one or two days to reenable Hubbell's work badge.  (*Id.* at 244).  Based on her experience at FedEx, Hubbell testified that this was an unreasonably long period of time.  (*Id.* at 245).  Third, a manager verbally reprimanded Hubbell in front of another employee for going to the restroom without signing the restroom sign-out sheet.  (*Id.* at 120-21).  Hubbell testified that she had witnessed many employees go to the restroom without signing the sheet

-11-

and that they were never reprimanded.  (*Id.* at 247).  Fourth, Hubbell once heard two managers talking about her on the radio system, in a way that other employees could hear.  (*Id.* at 248-50).  Specifically, the managers were saying that Hubbell had been talking with another employee, and they instructed Hubbell's supervisor to dismiss Hubbell for the day as punishment.  (*Id.*).  Hubbell testified at her deposition that even though many employees were talking to each other that day, she was the only one sent home.  (*Id.* at 250).

In Fall 2014, Hubbell had a discussion with manager William Mullins.  (Hubbell Dep. 277).  Mr. Mullins told Hubbell that "he felt as though [she] hadn't done anything wrong but the managers were trying to cover their tracks."  (*Id.*).

### G.   Hubbell Sues FedEx, and FedEx Terminates Hubbell.

In October 2014, Hubbell filed the instant lawsuit.  Although the deposition testimony of human-resources representative Vivian Garrey is not entirely clear, it appears that she at least was aware of Hubbell's lawsuit.  (*See* Garrey Dep. 17-20, 25-28).[5]

In early December 2014, Hubbell received three disciplinary write-ups for improperly leaving work.  First, on December 1, Hubbell received a write-up for leaving early on November 25 and 28.  (Pl.'s Ex. 19).  Hubbell testified that although her lead parcel sorter had instructed her not to leave on November 25, Hubbell's manager had

---

[5] During the summary-judgment motion hearing, counsel for FedEx explained that FedEx had waived service and that he had not told anybody at the Detroit facility about Hubbell's lawsuit.  The Court has no reason to doubt counsel's representation to the Court.  But even if the Court could consider this unsworn representation in deciding the summary-judgment motion, it would not help FedEx.  The Court must construe all evidence in favor of the non-moving party.

given her permission to leave.  (Hubbell Dep. at 260-61).  And Hubbell testified that she had not left early on November 28 but rather had left at the scheduled end of her shift. (*Id.* at 262).  Hubbell also testified that when she left, she had already worked a full forty hours that week.  (*Id.* at 267).  On December 5, Hubbell received the second write-up, for leaving early on December 2 and 4.  (Pl.'s Ex. 20).  At her deposition, Hubbell could not recall the specific details of these two incidents, but she testified that she "told someone before [she] left on every night or they told [her] to leave."  (Hubbell Dep. 264). Hubbell also testified that her work had been finished.  (*Id.* at 266).  Hubbell testified that other employees had been allowed to leave, and that she "didn't know [she] would be treated differently and not be allowed to leave."  (*Id.*; *see also id.* at 270).

On December 15, Hubbell received the third write-up, resulting in her termination. (Pl.'s Ex. 21).  The write-up states that Hubbell left work early without approval on December 9.  (*Id.*).  It also states that on December 12, managers asked Hubbell to clock back in after leaving work because they wanted to meet with her but that Hubbell refused and went home.  (*Id.*).  Hubbell testified at her deposition that she did not leave early on either date.  (Hubbell Dep. 271).  Rather, she left because she had worked over forty hours that week, and she believed that she was permitted to leave under company policy.  (*Id.*).  On December 9, in particular, she was the only parcel sorter still on the clock at the Detroit facility at the time she left; all of the others had been allowed to go home for the day.  (*Id.*).  Hubbell admitted in her deposition that she "disregarded" her managers when they asked her to clock back in on December 12 as she was leaving.  (*Id.* at 274).  Hubbell thought it was highly unusual that the managers wanted her to clock back in to have a meeting outside of her normal hours.  (*Id.*).  Manager

-13-

Christopher Jensen testified at his deposition that management had already decided to terminate Hubbell before December 12 and that the reason they wanted Hubbell to clock back in on that day was so that they could fire her.  (Jensen Dep. 169-71).

Ms. Garrey, the human-resources representative, testified that she made no attempt to get Hubbell's side of the story before approving the disciplinary write-ups and the final termination.  (Garrey Dep. 85, 91).  Ms. Garrey admitted that terminating an employee without first hearing his or her side of the story was not her normal policy.  (*Id.* at 91).  Various FedEx employees provided deposition testimony about FedEx's attendance policies.  The testimony at times was contradictory.  For the most part, however, the testimony contradicted Hubbell's deposition testimony that she could leave at will so long as her scheduled shift was complete.  (*See* Mullins Dep., Pl.'s Ex. 23, at 54-55; Jensen Dep. 132, 148; Ocelnik Dep. 56-57; Garrey Dep. 79).

Hubbell filed a third EEOC charge, alleging that she was terminated in retaliation for filing the instant lawsuit.  (*See* Pl.'s Ex. 22).  She subsequently added this allegation to her complaint in the instant lawsuit.

### H.    Other Evidence of Discrimination

Hubbell has also offered evidence of discrimination that went beyond her allegedly improper demotion.  Hubbell testified that a manager made discriminatory comments about women, and that another manager failed to condemn a subordinate's discriminatory comments.  (Hubbell Dep. 118, 278-79).  Hubbell also testified that she was repeatedly passed over for promotions, which were given instead to males.  In 2009, William Mullins was promoted to lead parcel sorter, while Hubbell remained a parcel sorter.  (Mullins Dep. 6; *see also* Reed Aff. ¶ 10; Reed Dep. 81, 153-54).  Hubbell

-14-

had seniority over Mr. Mullins, trained him when he first started at FedEx, and had a slightly higher level of education.  (Hubbell Dep 220, 285; Mullins Dep. 5-6).  In 2010, when Hubbell and Mr. Mullins were both lead parcel sorters, Mr. Mullins was promoted to a management position but Hubbell was not.  (Hubbell Dep. 220).[6]

## I.    Background for the Motion to Strike the McCloskey Affidavit

As stated above, Hubbell initiated the instant against FedEx in October 2014. Pursuant to her initial disclosure obligations under Federal Rule of Civil Procedure 26(a)(1)(A), Hubbell disclosed over ninety individuals who are likely to have discoverable information.  (*See* Doc. 18, Pl.'s Witness List).  One of those individuals was Rebecca  McCloskey, whose affidavit is the subject of the motion to strike.  (*See id.*)

During discovery, FedEx served a set of interrogatories and requests for production on Hubbell.  (*See* Def.'s Mot. Strike Ex. 8).  Two requests for production are of particular relevance in the Court's consideration of the motion to strike:

> 1.    Any documents relating to any statement, oral or written[,] taken or received by Plaintiff of a potential witness or persons with knowledge of facts pertinent to this lawsuit . . . .
> . . .
> 6.    Documents reflecting any communications between Plaintiff and any current or former employee of FedEx SmartPost regarding Plaintiff's employment with FedEx SmartPost and/or allegations in Plaintiff's Complaint.

---

[6] Hubbell also testified that various employees and former employees of FedEx had told her that FedEx management had discriminated against them or that they had witnessed such discrimination.  (*See* Hubbell Dep. 81-82, 314).  Such testimony is inadmissible hearsay, and the Court will not consider it.  *See supra* note 3.

(Def.'s Mot. Strike Ex. 8 at 15).  Hubbell had not yet received the McCloskey affidavit at the time she responded to the requests for production, and she therefore did not disclose the affidavit in her responses.

FedEx deposed Hubbell on August 20, 2015.  During the deposition, FedEx's counsel asked Hubbell why Ms. McCloskey was "on [Hubbell's] witness list."  (Hubbell Dep. 310).  Hubbell responded that Ms. McCloskey would be able to testify about FedEx's rapid promotion of a woman to a management role following Hubbell's demotion, which was done in order to "cover up for the fact that no female leads had been promoted."  (*Id.*).  FedEx never deposed Ms. McCloskey.

On October 2, 2015, Ms. McCloskey executed her affidavit.  Hubbell did not receive the McCloskey affidavit until October 27, which was after the close of discovery. On November 19, about six weeks after the close of discovery and three weeks after Hubbell received the McCloskey affidavit, FedEx filed its motion for summary judgment. On December 23, approximately eight weeks after Hubbell received the McCloskey affidavit, Hubbell filed her response to the summary judgment motion and attached the McCloskey affidavit in support.  When FedEx filed its reply in support of its summary judgment motion (Doc. 26), FedEx simultaneously filed the motion to strike, arguing that the McCloskey affidavit was responsive to requests for production 1 and 6 and therefore should have been disclosed earlier.

The scope of the McCloskey affidavit goes beyond discussion of the supposed "cover up."  (*See* McCloskey Aff., Pl.'s Ex. 3).  Ms. McCloskey stated that management at FedEx "treated its male employees more favorably than its female employees," and she provided a few examples.  (*Id.* ¶¶ 7-14).  Further, Ms. McCloskey stated that she

-16-

"witnessed management create a hostile work environment" for Hubbell and provided several examples of the harassment that she said Hubbell suffered. (*Id.* ¶¶ 15-20, 22-23). Although the scope of the McCloskey affidavit goes beyond the alleged cover-up, the affidavit is quite vague and largely cumulative of the other evidence described above. In particular, it is largely cumulative of Alphonse Reed's affidavit and deposition and Hubbell's deposition. Once all of the cumulative parts of the McCloskey affidavit are put aside, the affidavit adds the following alleged facts to the record:

1.   FedEx management would not allow Ms. McCloskey to leave early when she was pregnant and had an aching back, but management allowed a male to leave early when he complained about being hungry. (McCloskey Aff. ¶ 10).

2.   "Management at FedEx SmartPost would train more male employees to do certain things that could lead to promotions and an increase in pay but they would not do the same for women." (McCloskey Aff. ¶ 11).

3.   Both Ms. McCloskey and another female employee, Michelle Joseph, were passed over for opportunities for advancement in favor of less qualified male employees. (McCloskey Aff. ¶¶ 12-13).

4.   Female managers were given less favorable shifts than male managers. (McCloskey Aff. ¶ 14).

5.   Hubbell was an effective communicator and she was a better communicator than Jason Burgos, one of the managers. (McCloskey Aff. ¶ 23).

## II. MOTION TO STRIKE (DOC. 25)

The Court will first address the motion to strike the McCloskey affidavit, before proceeding to rule on the summary-judgment motion.  For the reasons explained below, the Court finds that Hubbell violated her discovery obligations when she failed to make a timely disclosure of the affidavit, but that it would be inappropriate to strike the McCloskey affidavit.  Instead, the Court will allow FedEx to depose Ms. McCloskey prior to trial.

### A.    Hubbell Violated Her Duty to Supplement Prior Disclosures.

A party has a duty to supplement its prior response to a request for production "in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1).  This duty to supplement continues throughout the trial proceedings, and it does not terminate at the end of the formal discovery period. *See Rodriguez v. IBP, Inc.*, 243 F.3d 1221, 1230 (10th Cir. 2001); *Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 358 (W.D.N.Y. 2011).  The Court finds that Hubbell violated this duty.  The McCloskey affidavit was responsive to FedEx's requests for production 1 and 6, and therefore Hubbell had a duty to supplement her prior responses in a timely manner when she received the affidavit.  Hubbell failed to do so.  Instead, she waited approximately eight weeks—until after FedEx had already filed its motion for summary judgment—to disclose it.

### B.    Hubbell's Discovery Violation Was Harmless, and Exclusion Is Not Appropriate.

Given that Hubbell violated her duty to supplement under Federal Rule of Civil Procedure 26(e), the Court must decide the appropriate sanction.  The ordinary

sanction is exclusion of the improperly withheld evidence, but a court has broad discretion to impose an alternate sanction.  *See*  Fed. R. Civ. P. 37(c)(1);  *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015).  The Court finds that exclusion is not an appropriate sanction.  It is true that Hubbell's counsel clearly violated a well-established discovery rule.  And it is also true that FedEx was justifiably surprised when Hubbell submitted the McCloskey affidavit as an exhibit to her response to FedEx's summary-judgment motion: FedEx had reasonably relied on Hubbell's representations during her deposition in deciding not to contact or depose Ms. McCloskey.  But the McCloskey affidavit is largely cumulative of other evidence in the record and what little non-cumulative information it contains is not enough to affect the Court's ruling on the summary-judgment motion.  Therefore, the discovery violation was harmless.  The Court will not strike or exclude the affidavit.

The Court will, however, allow FedEx to depose Ms. McCloskey prior to trial.  A discovery schedule "may be modified . . . for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  There is good cause to reopen discovery to allow FedEx to depose Ms. McCloskey because Hubbell, not FedEx, is at fault, and because reopening discovery for this limited purpose would not disrupt any pending proceedings in this case.  *See Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2006).

### III. Motion for Summary Judgment (Doc. 19)

FedEx, in its summary-judgment motion, argues that the Court should dismiss all four counts of Hubbell's amended complaint.  For the reasons explained below, the Court will grant FedEx's motion with respect to Count 3, but the Court will not dismiss Count 1, 2, or 4.

-19-

A.      **Summary-Judgment Standard**

Federal Rule of Civil Procedure 56(a) empowers a court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed courts' use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48; *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law,

the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence from which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

## B.    The Court Will Not Dismiss Count 1 (Gender Discrimination).

Hubbell alleges that FedEx discriminated against her on the basis of her sex by demoting her from her position as a lead parcel sorter.[7]  It is a violation of Title VII for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1) (emphasis added).  Title VII is also violated when "sex[] . . . was a *motivating factor* for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m) (emphasis added).  A claim alleging the former type of violation is called a "single-motive claim," while a claim alleging the latter type of violation is called a "mixed-motive claim." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008).  Mixed-motive claims are easier to prove, but a court is

---

[7] Hubbell makes various other allegations of discrimination in Count 1 of her amended complaint.  However, in her EEOC charge, Hubbell only alleged that FedEx discriminated against her by demoting her and by allowing a hostile work environment. (Pl.'s Ex. 12).  As FedEx notes, the Court may not consider Title VII claims that were not alleged in the EEOC charge and that could not reasonably have been expected to grow out of the EEOC charge.  *See Hopson v. DaimlerChrysler Corp.*, 157 F. App'x 813, 817 (6th Cir. 2005) (unpublished); *see also Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).

-21-

limited in the type of relief that it may grant under a mixed-motive claim. *See id.* at 397;

42 U.S.C. § 2000e-5(g)(2)(B). Hubbell alleges both types of claims in Count 1. For the

reasons explained below, the Court finds that Hubbell has adduced sufficient evidence

for both types of claims.

### 1.      Single-Motive Theory

A plaintiff may establish sex discrimination on a single-motive theory with either

direct evidence or circumstantial evidence. *See White v. Baxter Healthcare Corp.*, 533

F.3d 381, 391 n.5 (6th Cir. 2008). Hubbell has offered sufficient direct evidence for

Count 1 to survive summary judgment.

"Direct evidence of discrimination is 'that evidence which, if believed, requires the

conclusion that unlawful discrimination was at least a motivating factor in the employer's

actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en

banc) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d

921, 926 (6th Cir. 1999)). Direct evidence "does not require the fact finder to draw any

inferences to reach [the] conclusion" that discrimination motivated the employer's

actions. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2009). One type of direct

evidence is "[d]iscriminatory remarks by decision makers and those who significantly

influence[d] the decision-making process." *Sharp v. Aker Plant Servs. Grp., Inc.*, 726

F.3d 789, 798 (6th Cir. 2013). Comments that are "general, vague, or ambiguous,"

however, do not constitute direct evidence. *Id.* (quoting *Daugherty v. Sajar Plastics,*

*Inc.*, 544 F.3d 696, 708 (6th Cir. 2008)) (internal quotation marks omitted). Likewise, a

"stray statement . . . made . . . years before the adverse decision[]" does not constitute

direct evidence.  *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 549 (6th Cir. 2004).

Hubbell has offered evidence that the senior manager at the Detroit facility, Mr. Treman, told her that she should voluntarily accept a demotion from her position as lead parcel sorter because women are not suited for management positions.  Hubbell was demoted two years later.  Although Mr. Treman did not prepare the demotion paperwork or attend the demotion meeting, Mr. Treman testified that he would have had to approve the demotion.  Thus, Hubbell has offered evidence that an individual who had a significant influence (indeed, the final say) on the decision to demote her made patently discriminatory remarks about women and even expressed a view that Hubbell herself should step down because she is a woman.  This is direct evidence.  Mr. Treman's remarks might have been remote in time from the demotion, but they were hardly ambiguous or vague and they were not stray statements, unrelated to the topic of Hubbell's demotion.

Admittedly, this is a close case.  A remark made two years before the demotion is not the strongest direct evidence of discriminatory intent. *Cf. Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (holding that discriminatory comments made four days after the decision to terminate the plaintiff constituted direct evidence because they "were both 'temporally [and] topically related' to the decision to choose [the plaintiff] to lay off" (citation omitted) (alteration in original)).  But the Sixth Circuit has indicated that expressly discriminatory comments can constitute direct evidence of discriminatory intent even if they were quite remote in time from the allegedly discriminatory action.  *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d

-23-

531, 549 (6th Cir. 2008) (suggesting, in dicta, that two discriminatory remarks made by the plaintiff's managers eight years and one year before the plaintiff's termination constituted direct evidence of discrimination).

Even if Mr. Treman's remarks to Hubbell did not constitute direct evidence in favor of her discrimination claim, there would still be sufficient circumstantial evidence in the record for Hubbell's claim to survive the summary-judgment motion. Circumstantial evidence is evidence that "does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler*, 317 F.3d at 570. In order for a discrimination claim to survive the summary-judgment stage on the basis of circumstantial evidence, the "plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a [similarly situated] person outside of the protected class.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003)). In the plaintiff makes out a *prima facie* case, the burden "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action." *Id.* "If the defendant satisfies this burden, the plaintiff 'must then prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.* (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003)).

Hubbell has established a *prima facie* case of discrimination. First, FedEx does not dispute that Hubbell is a member of a protected class. Second, Hubbell was subjected to an adverse employment decision when she was demoted from the lead-

parcel-sorter position.  Third, Hubbell has offered evidence that she was qualified for the lead-parcel-sorter role.  She had worked for FedEx for a number of years and received awards for her good job performance.  Alphonse Reed testified that Hubbell's pallets (the packing of which was a key component of Hubbell's work) were generally well-packed.  And fourth, Hubbell has offered evidence that she was replaced by someone outside of the protected class—namely, a male named "Mike."  According to Mr. Reed's testimony, Mike's pallets were not packed as well as Hubbell's.

FedEx argues, however, that the fourth prong of the *prima facie* case is not satisfied, because Hubbell "cannot identify any male lead Parcel Sorters, who exhibited [a pattern of misconduct] over a period of months and were not demoted."  (Def.'s Mot. Summ. J. 12).  But Hubbell testified repeatedly that the disciplinary write-ups she received in the time leading up to her demotion (or most of the write-ups, at least) were based on fabricated claims of misconduct.  Indeed, she alleges that her managers improperly and repeatedly wrote her up in order to falsify a justification for her subsequent demotion.  In order to accept FedEx's argument, the Court would have to resolve disputed facts against Hubbell, which would be inappropriate at the summary-judgment stage.  *Compare Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 651-52 (6th Cir. 2015) (holding that a jury should have been allowed to decide whether the plaintiff was actually insubordinate where the employer had alleged that he had been "[u]nwilling[] to accept and apply constructive coaching" and had made "out of line" comments), *with Hegger v. Visteon Auto. Sys., Inc.*, 186 F. App'x 555, 559-60 (6th Cir. 2006) (unpublished) (finding that the plaintiff's discipline was "in accord [with the

company's] policy . . . for attendance" where the plaintiff "*acknowledged* that he did not have his supervisor's permission to leave" (emphasis added)).

Because Hubbell has established a *prima facie* case, FedEx must come forward with a nondiscriminatory reason for Hubbell's demotion. FedEx has clearly satisfied this burden. There is a mountain of evidence in the record that supports FedEx's position that Hubbell repeatedly misbehaved at work and was an ineffective leader. This evidence includes numerous disciplinary write-ups, two negative yearly evaluations, Hubbell's own admission that she failed to provide responses on the self-evaluation portion of her performance review, and the deposition testimony of numerous witnesses about Hubbell's alleged behavioral problems.

Thus, the burden shifts back to Hubbell to show that FedEx's stated reasons for demoting her were pretextual. A plaintiff may establish pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her demotion], or (3) that [the proffered reasons] were insufficient to motivate her [demotion]." *Russell*, 537 F.3d at 604 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)) (emphases removed) (internal quotation marks omitted). Hubbell has offered evidence that FedEx's proffered reasons for demotion had no basis in fact. Hubbell testified that most or all of the allegations of misconduct in the disciplinary write-ups she received were fabricated by managers at FedEx. Moreover, Hubbell and Alphonse Reed testified that any poor performance on Hubbell's part was due to the way in which management intentionally hobbled her. This testimony may not stand up to scrutiny at trial. But it would be inappropriate for the Court to make credibility determinations against the non-movant at the summary-

-26-

judgment stage. Hubbell has also offered evidence that the proffered reasons did not actually motivate her demotion. Hubbell testified that Mr. Treman told her that he wanted her out of the lead-parcel-sorter position because she was a woman. Moreover, Hubbell and Mr. Reed testified that Hubbell was subjected to unusual and intense scrutiny at the behest of management, suggesting that management bore some sort of animosity towards Hubbell. Given the senior manager's discriminatory comments, there is reason to infer that the animosity was discriminatory in nature.

In sum, Hubbell has presented sufficient direct and circumstantial evidence for Count 1 to survive summary judgment on a single-motive theory.

### 2. Mixed-Motive Theory

A plaintiff alleging a mixed-motive claim is alleging that "both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). The burden-shifting framework discussed above for single-motive claims does not apply to mixed-motive claims. *See id.* at 400. Rather, "to survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for the defendant's adverse employment action." *Id.* (quoting 42 U.S.C. § 2000e-2(m)).

Hubbell has satisfied both elements for a mixed-motive claim. FedEx took an adverse employment action against her when it demoted her. And Mr. Treman allegedly told Hubbell in August 2011 that women, including Hubbell, are not suited for management positions. This is sufficient evidence that the decision to demote

Hubbell—a decision over which Mr. Treman had the final say—was motivated in part by the fact that Hubbell is a woman.  Therefore, Count 1 also survives summary judgment on a mixed-motive theory.

### C.    The Court Will Not Dismiss Count 2 (Retaliation).

Hubbell alleges that management at the Detroit facility retaliated against her after she filed her first EEOC charge, in violation of Title VII.[8]  For the reasons explained below, the Court finds that Hubbell has adduced sufficient evidence in support of this claim, and the Court will therefore deny FedEx's summary-judgment motion with respect to Count 2.

A retaliation claim will survive summary judgment only if the plaintiff establishes a *prima facie* case.  *See EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015).  To make out a *prima facie* case, the plaintiff must offer evidence that shows that the plaintiff "(1) engaged in activity protected by Title VII; (2) the defendant knew of [the plaintiff's] protected activity; (3) thereafter, the defendant took adverse action against the [plaintiff]; and (4) a causal connection existed between the protected activity and the materially adverse action."  *Id.*  Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "proffer some legitimate, nonretaliatory reasons for its

_____

[8] In her first EEOC charge, Hubbell alleged that FedEx management retaliated against her when she filed a complaint with FedEx's human-resources department.  But Count 2 of Hubbell's amended complaint does not allege retaliation on this theory.  (*See* Pl.'s First Am. Compl. ¶ 45).  Hubbell's brief opposing the summary-judgment motion makes passing mention of Hubbell's complaint to human resources, but it does not specifically argue that FedEx retaliated against her for making the complaint.  (*See* Pl.'s Resp. Def.'s Mot. Summ. J. 17).  Thus, the Court will not address this theory of liability.  *Cf. Mitchell v. McNeil*, 487 F.3d 374, 379 (6th Cir. 2007) ("Plaintiffs, . . . did not  raise this claim . . . , much less plead it in their complaint, and accordingly it has been waived.").

actions."  *Id.*  If the defendant proffers "such reasons, the burden of persuasion shift[s]

back to [the plaintiff] to show that  . . . the reasons were a pretext for retaliation."  *Id.*

Hubbell is able to establish a *prima facie* case for her Count 2 retaliation claim.

The first two elements are clearly satisfied.  FedEx does not dispute that Hubbell

engaged in a protected activity when she filed her first EEOC charge.  And there is

evidence in the record that FedEx was aware of the charge:  Human-resources

representative Vivian Garrey testified that she was aware of the EEOC charge and that

she informed Mr. Treman, the senior manager, about it.

It is less obvious that the third element is satisfied.  To satisfy "the third element

of the prima facie case, the adverse employment action must be 'materially adverse.'"

*Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002).  A materially adverse

employment action

> must be more disruptive than a mere inconvenience or an alteration of job
> responsibilities.  A materially adverse change might be indicated by a
> termination of employment, a demotion evidenced by a decrease in wage
> or salary, a less distinguished title, a material loss of benefits, significantly
> diminished material responsibilities, or other indices that might be unique
> to a particular situation.

*Id.* (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)) (internal quotation

marks omitted).  Hubbell's disciplinary write-ups do not constitute materially adverse

actions because they (except perhaps for the write-ups that resulted in her demotion

and her termination, which are not relevant to Count 2) did not result in a material loss

of benefits or salary or any other harm to the plaintiff.  *See Choulagh v. Holder*, 528 F.

App'x 432, 438 (6th Cir. 2013) (unpublished); *Hegger v. Visteon Auto. Sys., Inc.*, 186 F.

App'x 555, 559-60 (6th Cir. 2006) (unpublished).  Similarly, FedEx's intense monitoring

of Hubbell and most of FedEx's other alleged acts of harassment did not result in a
material harm to Hubbell.  FedEx's alleged refusal to allow Hubbell to clock in and out at
the same time as her fellow employees, however, constituted a materially adverse
action.  FedEx allegedly allowed other parcel sorters to clock in and out fifteen minutes
before and after their shifts, but only allowed Hubbell to clock in and out three minutes
before and after her shift.  The consequence of this was that other employees were able
to earn pay for an additional twenty-four minutes of work each day compared to
Hubbell.  This was effectively a pay cut.  Thus, Hubbell has satisfied the third element of
the *prima facie* case.

The Court also finds that Hubbell has established the fourth element of the *prima
facie* case.  To establish the fourth element, "a Title VII [retaliation] claimant must show
that his or her protected activity was a but-for cause of the adverse action by the
employer."  *New Breed Logistics*, 783 F.3d at 1070.  The Court acknowledges that
Hubbell stated in her second EEOC charge that management's refusal to allow her to
clock in and out fifteen minutes before and after her shift began in late August 2013,
and that Hubbell did not file her first EEOC charge until November 2013.  This casts
substantial doubt on Hubbell's claim that the refusal to allow Hubbell to clock in and out
with the other employees was retaliation for the filing of the first EEOC charge.  But it is
also possible that Hubbell was simply confused about the relevant dates when she
wrote in her EEOC charge that the clock issue began in August 2013.  Hubbell's
deposition testimony is not entirely clear, but some of it suggests that the clock issue
arose after Hubbell filed her EEOC charge.  Thus, the Court concludes that Hubbell has
offered sufficient evidence to satisfy the causation element.

Because Hubbell has established a *prima facie* case, the burden shifts to FedEx to articulate a non-retaliatory reason for its action against Hubbell.  FedEx has offered a non-retaliatory reason for its refusal to allow Hubbell to clock in and out fifteen minutes before and after her shift.  In particular, FedEx has offered evidence that lead parcel sorters had this privilege, but that most parcel sorters and assistants did not.

Because FedEx has offered a non-retaliatory reason for refusing to allow Hubbell to clock in and out fifteen minutes before and after her shift, the burden shifts back to Hubbell to offer evidence of pretext.  Hubbell has satisfied her burden.  Hubbell testified that the refusal to allow her to clock in with the other employees was retaliation, implying that it began after she filed her EEOC charge and not immediately after her demotion.  Moreover, Hubbell testified that when she was a parcel sorter, the other parcel sorters were allowed to clock in and out earlier and later than she was allowed, which tends to show that FedEx's refusal to allow Hubbell to clock in and out fifteen minutes before and after her shift had nothing to do with Hubbell's demotion but rather was motivated by a retaliatory intent.  Finally, Hubbell has offered evidence that FedEx management harassed her in other ways, such as by giving her unwarranted disciplinary write-ups.  Although none of these other acts of harassment constitutes cognizable retaliation, these other acts may tend to show that FedEx management bore substantial animus towards Hubbell after she filed her EEOC charge.  *See Harrison v. Metropolitan Gov't of Nashville & Davidson Cty.*, 80 F.3d 1107, 1119 (6th Cir. 1996), *overruled on other grounds as recognized by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 n. 6 (6th Cir.1999) (finding that the plaintiff's retaliation claim was supported in part by evidence showing that there was "an atmosphere in which the plaintiff's activities

-31-

were scrutinized more carefully than those of comparably situated employees . . . and that the [employer] took every opportunity to make his life as an employee unpleasant").

In sum, Hubbell has established a *prima facie* case and offered evidence of pretext.  Thus, her retaliation claim in Count 2 survives the instant motion for summary judgment.

**D.     The Court Will Dismiss Count 3 (Hostile Work Environment).**

Hubbell alleges that she was subjected to a hostile work environment in violation of Title VII.  She alleges that a pattern of harassment—including unwarranted disciplinary actions and efforts by management to hobble her job performance—began in 2011 after Mr. Treman pressured Hubbell to accept a demotion because of her sex. Hubbell further alleges that this pattern of harassment continued following Hubbell's involuntary demotion and the filing of her first EEOC charge.  Thus, Hubbell has set forth two different theories for her hostile-work-environment claim: discriminatory hostile work environment and retaliatory hostile work environment.  For the reasons explained below, Hubbell has failed to adduce sufficient evidence to create a genuine issue of material fact on either theory, and thus the Court will grant FedEx's summary-judgment motion with respect to Count 3.

**1.     Discriminatory Hostile Work Environment**

A plaintiff establishes a *prima facie* case of discriminatory hostile work environment under Title VII by offering evidence that

> (1) he was a member of a protected class; (2) he was subject to
> unwelcomed harassment; (3) the harassment was [based on membership
> in the protected class]; (4) the harassment unreasonably interfered with
> his work performance by creating an environment that was intimidating,

-32-

hostile, or offensive; and (5) the [employer is] liable for the harassing conduct.

*Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 627 (6th Cir. 2013).  Hubbell's claim fails at the fourth element.

To satisfy the fourth element of the *prima facie* case, Hubbell must show that the harassment was "severe or pervasive enough to create an objectively hostile or abuse work environment—an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  The environment must also have been hostile or abusive from the subjective perspective of the plaintiff.  *Id.*  A court should consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the] employee's work performance."  *Id.* at 23.

Although Hubbell has offered substantial evidence of harassment, the Court is ultimately compelled to conclude that the alleged harassment cannot amount to severe or pervasive harassment, as a matter of law.  Hubbell has offered evidence that she was subjected to unwelcome harassment: Mr. Treman allegedly told her that women are ill-suited for management positions; various lower-level managers disciplined Hubbell for allegedly fabricated infractions; lower-level managers allegedly undermined Hubbell's ability to succeed as a lead parcel sorter by assigning her to the most difficult area of the Detroit facility and depriving her of the competent parcel sorters; and lower-level managers were allegedly constantly watching Hubbell from the catwalk, which they did not do with other employees.

-33-

Neither party has brought a case to the Court's attention involving similar facts to the case at hand, but a comparable case is the Sixth Circuit case *Clay v. United Parcel Service, Inc.*, 501 F.3d 695 (6th Cir. 2007). In *Clay*, the plaintiff alleged a racially hostile work environment on the basis of "fifteen specific incidents spanning a two-year period." *Id.* at 707. The plaintiff's supervisor "constantly criticized [her] regarding matters for which he did not criticize her white coworkers[,] . . . including for eating during work, for leaving her work station to get a cup of coffee, for using the bathroom at the end of her break, and for the size of her earrings." *Id.* at 702. Once, the supervisor criticized the plaintiff in front of other employees for eating a doughnut left for the employees in the break room. *Id.* The supervisor also constantly criticized the plaintiff for taking too long to get from the entrance to her work area and "had her timed to record how long it took to get to her work station." *Id.* Furthermore, the supervisor regularly ordered the plaintiff to complete tasks "outside of her job description; for example, . . . tak[ing] company supplies, like toilet paper, over to the supply trailer." *Id.* The supervisor also "falsely accused [the plaintiff] of taking boxes while on company time." *Id.* Finally, the plaintiff reported an incident in which "someone cut the lock on her desk, removed the supplies, and placed them in a box" while a white employee was allowed to store his supplies in his desk. *Id.* The Sixth Circuit held that this pattern of harassing conduct was insufficiently serious or pervasive to create an objectively hostile work environment.

Hubbell's situation is very similar to the *Clay* plaintiff's. She, like the *Clay* plaintiff, was allegedly repeatedly criticized by supervisors without justification and was asked to do jobs outside of her job description. Moreover, like the *Clay* plaintiff, who was timed by her supervisor as she walked from the warehouse's entrance to her work station,

-34-

Hubbell was subjected to unusual monitoring by her supervisors.  Hubbell was given a number of allegedly unjustified write-ups for absenteeism, insubordination, and a safety violation, but the *Clay* plaintiff was falsely accused of stealing, an even more humiliating accusation.  In sum, the severity of Hubbell's harassment is comparable to the severity of the *Clay* plaintiff's harassment.  And Hubbell's harassment does not appear to have been any more pervasive than the *Clay* plaintiff's.  Therefore, like the plaintiff in *Clay*, Hubbell has failed to establish the fourth element of her *prima facie* case.

Moreover, as FedEx notes, Hubbell has alleged only one incident (or possibly two) in which Mr. Treman directed discriminatory language towards her.  Isolated remarks are insufficient to constitute pervasive or severe harassment.  *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 513 (6th Cir. 2011) (holding that "despicable" "racist" statements were not sufficiently "severe" or "pervasive" because they were "isolated" and were not physically threatening or humiliating).

### 2.  Retaliatory Hostile Work Environment

A plaintiff establishes a *prima facie* case of retaliatory hostile work environment by offering evidence that "(1) she engaged in [protected activity]; (2) the defendant was aware that the plaintiff engaged in the protected activity; (3) the plaintiff suffered 'severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the . . . harassment.'"  *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 707 (6th Cir. 2012) (unpublished) (quoting *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)) (omission in original).  Hubbell again fails to satisfy the third element of the *prima facie* case, for the reasons explained immediately above.  The post-EEOC-complaint

harassment, like the pre-EEOC-complaint harassment, was simply not pervasive or serious enough to create an objectively hostile or abusive work environment. Therefore, Hubbell has failed to make out a *prima facie* case of retaliatory hostile work environment.[9]

Because Hubbell failed to establish a *prima facie* case of hostile work environment under either of the two theories, the Court will grant FedEx's summary-judgment motion with respect to Count 3 and will dismiss Count 3.

### E.    The Court Will Not Dismiss Count 4 (Retaliation).

Hubbell added Count 4 in her amended complaint.  She alleges that FedEx retaliated against her by terminating her for filing the instant lawsuit.  For the reasons explained below, the Court will deny FedEx's summary-judgment motion with respect to Count 4.

The burden-shifting framework and the *prima facie* elements of a retaliation claim are set forth in the Count 2 discussion above.  Hubbell has established the *prima facie* case.  First, FedEx does not deny that Hubbell engaged in a protected activity when she filed the instant lawsuit.  Second, there is evidence that human-resources representative Vivian Garrey and at least some managers were aware of the lawsuit.  Third, FedEx took a materially adverse employment action against Hubbell when it terminated her in December 2014.  And fourth, the short period of time (less than two

---

[9] As explained above in the discussion about Count 2, FedEx's refusal to allow Hubbell to clock in and out at the same time as the other employees constituted a materially adverse employment action.  But this refusal was "a discrete act," actionable as a claim for retaliation, but "decidedly not actionable as a hostile-work-environment claim."  *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708 (6th Cir. 2007).

months) between the filing of Hubbell's complaint and FedEx's decision to terminate

Hubbell is sufficient circumstantial evidence that Hubbell's protected activity caused

FedEx to terminate her. *See Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006).

FedEx argues, however, that Hubbell has failed to establish the causation

element of the *prima facie* case.  FedEx argues that the relatively short period of time

between the filing of the present action and FedEx's decision to terminate Hubbell does

not establish that Hubbell's protected activity motivated the termination; rather, FedEx

argues that the Court must only consider the period of time between Hubbell's filing of

the EEOC charges and FedEx's decision to terminate Hubbell.  Since many months

passed between Hubbell's filing of her EEOC charges and FedEx's decision to

terminate Hubbell, FedEx argues that there is insufficient circumstantial evidence of

causation.  The problem with FedEx's argument is that in Count 4, Hubbell is arguing

that FedEx retaliated against her for filing suit, not for filing her EEOC charges.

Hubbell's act of filing suit was itself a protected activity distinct from her protected acts

of filing the two EEOC charges.  Thus, the relevant date for the causation analysis is the

date that Hubbell filed suit, not either of the dates for her EEOC charges.[10]

---

[10] FedEx contends that *Clark County School District v. Breeden*, 532 U.S. 268
(2001), and *Grey v. City of Oak Grove*, 396 F.3d 1031 (8th Cir. 2005), require a different
result.  But the two cases are distinguishable.  Unlike the plaintiff in *Breeden*, Hubbell is
not arguing causation based on a short temporal gap between the issuance of the right-
to-sue letter (which is a government action, not a protected activity by the employee)
and FedEx's decision to terminate her.  Rather, Hubbell is arguing causation based on
the short temporal gap between her initiation of the instant legal action (which *is* a
protected activity) and FedEx's decision to terminate her.  And the plaintiff in *Grey*
engaged in only a single protected activity (seeking overtime pay that he was owed); the
question in that case was when the employer was given notice of that protected activity.
In the instant case, by contrast, Hubbell has engaged in three different protected
activities while she worked at FedEx: She filed two EEOC charges and one lawsuit.

FedEx also contends that Hubbell has failed to establish the causation element of the *prima facie* case because she has failed to establish but-for causation. But, as will be explained below in the pretext analysis, Hubbell has offered testimony rebutting FedEx's argument that it had a reason to terminate her and showing that Hubbell was terminated due to her protected activity. Thus, there is evidence that could persuade a juror that Hubbell's act of filing the instant lawsuit was the but-for cause for her termination.

In sum, Hubbell has established a *prima facie* case. The burden therefore shifts to FedEx to come forward with evidence of a non-retaliatory motive for Hubbell's termination. FedEx has satisfied its burden. According to FedEx, Hubbell was terminated because she was insubordinate and because she repeatedly left work early in late November and early December—FedEx's peak season. FedEx has provided disciplinary write-ups and deposition testimony from multiple witnesses to back up this claim.

Thus, the burden shifts back to Hubbell to demonstrate that FedEx's stated reasons for her termination are pretextual. The Court, construing the evidence in favor of Hubbell, finds that Hubbell has provided sufficient evidence of pretext. FedEx claims that Hubbell was terminated after repeatedly leaving work early without permission, even after having been warned. At her deposition, Hubbell asserted that she did nothing wrong and that the disciplinary write-ups and her ultimate termination were unwarranted. For each of the incidents discussed in her deposition, Hubbell gave some

---

FedEx received notice of the three different protected activities at different times.

-38-

combination of the following explanations for leaving:  It was her scheduled time to leave, management had given her permission to leave, she had already worked over forty hours in the week, and the other parcel sorters had been allowed to leave.  It appears to be true that FedEx had the right to discipline her if Hubbell left merely because she had already worked for forty hours.  But if Hubbell was indeed the only parcel sorter who was asked to stay late, as she claims, then it would appear that FedEx was trying to force Hubbell out of her job or set her up to be terminated by subjecting her to unreasonable attendance expectations.  Also, if Hubbell in fact received permission to leave before she left on each day, as she claims, then it would appear that Hubbell did not violate FedEx policy.  Depending on which evidence is credited by the jury, the alleged pattern of harassing conduct on the part of FedEx management going all the way back to Hubbell's first EEOC charge could support a finding that FedEx's stated reasons for terminating Hubbell were pretextual.  In sum, Hubbell has offered evidence that the stated reason for her termination did not actually motivate FedEx's decision to terminate Hubbell and that there is no basis in fact for FedEx's decision to terminate her.  Hubbell has met her burden of establishing pretext.

The Court therefore will deny FedEx's summary-judgment motion with respect to Count 4.

### IV. CONCLUSION

For the reasons stated above, FedEx's motion to strike the McCloskey affidavit (Doc. 25) is GRANTED IN PART and DENIED IN PART.  IT IS ORDERED that discovery shall be reopened for the limited purpose of permitting FedEx to depose Rebecca McCloskey.  Further, for the reasons stated above, FedEx's motion for

summary judgment (Doc. 19) is GRANTED solely with respect to Count 3 of the first amended complaint.  IT IS ORDERED that Count 3 is DISMISSED.  FedEx's motion for summary judgment is DENIED with respect to Counts 1, 2, and 4.

IT IS SO ORDERED.

Dated:  June 9, 2016

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 9, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk